EARL W. SMITH, Justice.
 

 Missouri-Kansas-Texas Railroad Company (MKT) appeals from a judgment awarding appellee Guadalupe C. Alvarez damages for injuries sustained by him when he was struck by an MKT train at a crossing. The trial court’s judgment is based upon the jury’s answer to Special Issue No. 1, in which the jury found only one act of negligence by MKT. In assuming in such issues that MKT did “not timely apply its brakes,” the court’s charge, submitted over the objection of MKT, constituted an impermissible comment on the weight of the evidence. The judgment will be reversed and the cause remanded.
 

 The controlling issue in this case is whether the train crew made a timely application of the brakes. Special Issue No. 1 submitted by the court was as follows:
 

 On the occasion in question do you find from a preponderance of the evidence that the Missouri-Kansas-Texas Railroad
 
 *340
 
 Company was negligent in its (a) speed, (b)
 
 in not timely applying the brakes,
 
 (c) in its lookout or (d) in failing to sound the train whistle or horn, (emphasis added).
 

 The jury answered “No” to (a), (c) and (d), but answered “Yes” to (b), and found that such negligence was a proximate cause of the occurrence in question. MKT objected to the issue for the reason that “the wording of this issue constitutes an improper comment on the weight of the evidence by implying that the brakes were not timely applied_” MKT, in its objection, suggested that the proper wording of (b) in special issue No. 1 should be “in its application of the brakes.”
 

 Under former practice, Tex.R.Civ.P.Ann. 272 (1971), the trial judge was required to frame his charges so that he did “not therein comment on the weight of the evidence.” The quoted phrase was deleted from Rule 272 by the 1973 amendments to the Rules, and the last paragraph of Rule 277 was added in 1973, reading as follows:
 

 The court
 
 shall not in its charge comment directly on the weight of the evidence
 
 or advise the jury of the effect of their answers, but the court’s charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence or advises the jury of the effect of their answers where it is properly a part of an explanatory instruction or definition.
 

 Tex.R.Civ.P.Ann. 277 (1973). (emphasis added).
 

 Notwithstanding the 1973 amendment to Rule 277,
 
 supra,
 
 to permit
 
 incidental
 
 comments on the weight of the evidence, the trial judge is prohibited by such rule from making
 
 direct
 
 comments, which has been proscribed before and since the amendment.
 
 Gleghorn v. City of Wichita Falls,
 
 545 S.W.2d 446, 447 (Tex.1976);
 
 Briseno v. Martin, 561
 
 S.W.2d 794, 796 (Tex.1977);
 
 City of Pearland v. Alexander,
 
 483 S.W.2d 244, 248-49 (Tex.1972);
 
 Capitol Title Co. v. Mahone,
 
 619 S.W.2d 204, 206 (Tex.Civ.App.1981, no writ);
 
 Otto Vehle & Reserve Law Officers Ass’n v. Brenner,
 
 590 S.W.2d 147, 150 (Tex.Civ.App.1979, no writ);
 
 City of Beaumont v. Fuentez,
 
 582 S.W.2d 221, 224 (Tex.Civ.App.1979, no writ);
 
 Cactus Drilling Co. v. Williams,
 
 525 S.W.2d 902, 906-7 (Tex.Civ.App.1975, writ ref’d n.r.e.).
 
 See
 
 Figari, Graves, and Moss,
 
 Texas Civil Procedure,
 
 36 Sw.L.J. 435, 459-60 (1982) and Pope and Lowerre,
 
 The State of the Special Verdict—
 
 1979, 11 St. Mary’s L.J. 1, 45 (1979).
 

 The rule is well defined in
 
 Texas Emp. Ins. Ass’n v. Percell,
 
 594 S.W.2d 182, 184 (Tex.Civ.App.1980, writ ref’d
 
 n.r.e.),
 
 wherein the court said:
 

 For more than a century and a quarter in Texas, the trial court has been prohibited from directly commenting on the weight of the evidence in the jury charge. 3 R. McDonald,
 
 Texas Civil Practice
 
 § 12.032.2 (1970). The prohibition currently is expressed in the Texas Rules of Civil Procedure, Rule 277, in these words: “The court shall not in its charge comment directly on the weight of the evidence_” A prohibited comment occurs when a special issue is so worded that it indicates an opinion by the trial court as to the verity of the fact inquired about.
 
 Metal Structures Corp. v. Plains Textiles, Inc.,
 
 470 S.W.2d 93, 102 (Tex.Civ.App.—Amarillo 1971, writ ref’d n.r.e.).
 

 Thus, it is error to submit to the jury a special issue which assumes the existence of disputed material facts.
 

 Alvarez argues that the evidence is factually undisputed that MKT did not apply its brakes in a timely manner. If this be true, there would be no error in the trial court’s assumption of such fact in the issue.
 
 El Paso Drive-In Cafes, Inc. v. Wilson,
 
 467 S.W.2d 200, 203 (Tex.Civ.App.1971, no writ).
 

 UNDISPUTED BACKGROUND FACTS
 

 The accident occurred approximately 11:29 p.m. on December 26, 1975, at the point where Morrell Road in Round Rock crosses the railroad track in question. MKT’s train was west-bound. As it approached the city limits of Round Rock, it was travelling at a constant speed of 40 miles per hour — reduced by order of the
 
 *341
 
 railroad from the normal speed limit of 50 miles per hour, due to holiday traffic. The four-door car in which Alvarez was a backseat passenger was north-bound on Morrell Street.
 

 MKT’s train consisted of three diesel electric pulling engines, 30 loaded and 22 empty cars. Its total weight was 3317 tons, its length 2606 feet. At 2034 feet east of the crossing there was a two-crossing whistle board sign on the railroad right of way. The purpose of the sign is to inform the front-end crew of the train that they are approaching two crossings for which they have to go through the whistle sequence hereinafter described. East of the crossing was a railroad trestle, with the east end thereof 1754 feet from the center of the crossing and the west end 1504 feet therefrom. Two switch stands were east of the crossing, one 746 feet and the other 400 feet from the center of the Morrell Street crossing. On Morrell Street, on the switch side of the crossing, there was a stop sign, located 12 feet south of the nearest rail.
 

 To resolve the question of whether Special Issue 1 was erroneous, a summary of the testimony is necessary.
 

 Alvarez lived in Round Rock. Antonio Ledesma (Alvarez’s brother-in-law) and Antonio Tijerina were visiting at the Alvarez home on December 26. At the request of Alvarez’s wife, the three men left in Tijeri-na’s car to go for food. According to Tijer-ina and Ledesma, the latter drove the car because Tijerina was not familiar with Round Rock. Ledesma also said that Tijer-ina did not feel like driving. The train conductor said that Tijerina told him that
 
 he
 
 was the driver.
 

 Ledesma’s testimony was that: he drove, Tijerina was the right front-seat passenger, and the plaintiff, Alvarez was the right rear-seat passenger; Ledesma approached the stop sign at 15 to 20 miles per hour; he stopped, looked both ways, did not hear a whistle or horn, decided it was safe to proceed, and drove onto the crossing tracks, when the car stalled; the car “just cut-off”; he unsuccessfully attempted to start the car a couple of times, looked to his right, and saw the train coming when the train lights caught his attention; as he tried to start the car, Tijerina got out and started waving at the train to stop; Ledes-ma screamed for everyone to get out; when he saw the train lights, it was obvious that everyone had time to do so; he and Tijerina ran to the front of the car; he did not see what Alvarez was doing; he knew what it was to “play chicken,” i.e., make it look like a stop, then “take off”; he did not intentionally stop the car on the tracks; Tijerina had said that the car had been “missing a little bit”; it was after the car stalled that he first saw the train lights; he did not tell the DPS officer that he had seen the train before he went on the crossing; he thought he had time to get across, and imagined that he could have if the car had not stalled; he “might have” taken a chance with trains before.
 

 Tijerina, the owner of the car, testified that as far as he knew, all four doors and the door locks were working all right; when they got to the crossing, he looked both ways and did not see a train; he first saw the train light after the car had stopped on the crossing after pulling out from the stop sign; as soon as Ledesma saw the light, he told “us” to get out; he did so, waved a couple of times, kept looking at the light, and ran beyond the front of the car; he did not see Alvarez and did not know what Alvarez did.
 

 Alvarez testified: that he was the right-rear passenger in the four-door car; when he got in, he locked the door, as was his habit; Ledesma stopped at the stop sign; Alvarez did not hear a train whistle or bell nor see the train lights; Ledesma started over the tracks; the car stalled; Ledesma could not re-start it; he did not remember Ledesma seeing the train lights and hollering for everyone to get out; he realized the car was stopped on the tracks; there was a point in time when everyone started getting out; he said “I was real scared” and “I panicked”; he tried to open the door handle, which was jammed; he tried to push the front seat forward, but could not do so; he thought it was a two-door car; he jumped over the front seat and exited the car from the front; at the time he was getting out of the car he saw the train light
 
 *342
 
 “real close to me”; that is all that he could remember; on his deposition, after stating that he did not see the train and did not hear anything, he said no one said anything to him about getting out of the car; on deposition he also said he first saw the train “when I was getting out.... I had jumped to the front, but my foot had gotten caught, and I jumped, but I jumped too late.”
 

 Robert Donnell, the MKT engineer, testified: the train came through Hutto and Round Rock at 40 miles per hour with no reduction in speed until he applied the emergency brakes; the Morrell street crossing was the third crossing in Round Rock; as the train approached the stretch of track in question, it came around a slight curve and straightened up at about the first whistle board, from which he could see the crossing; the train light is bright enough so that you can see ⅛⅛ of a mile ahead; he began the whistle sequence, somewhere between the overpass of highway 281 and the trestle; the whistle sequence is “a long and a long and a short and another long,” which he follows until the train occupies the crossing; four to seven seconds elapses between each blowing of the horn; he saw the car when he was probably in the middle of the “first long”; the car was a few feet from the track (two to eight feet), was moving slowly, and had just come from behind some pillars; it was possible that the car could have started up from a parked position.
 

 The engineer said, further: that the car stopped with its front wheel coming to rest in the ruts of the north rail; at this time, he was just about to blow his second blow of the horn; he was two or three pole lengths, or 1000 feet from the crossing when the car came to a stop on the rails; at this time the passenger door came open and a person in a white T-shirt jumped out, and standing between the car and the engine waved his arms a couple of times and left; shortly thereafter, the driver came out and ran toward the front of the car, he had not applied the emergency brakes at this time; it was 5 to 6 seconds from the time the car came to rest on the tracks until he applied the emergency brakes; he waited such time because he thought people in the car could get out of the car and get out of the way; he put the train in emergency somewhere in the midst of the switch, in the vicinity of the “frog” (where the rail going to the passing track crosses the main line); he estimated that it was 500 feet from the crossing when he put the train into emergency; this means that he travelled 500 feet from the time he first saw the car on the tracks until he put the train in emergency; at the time the passenger came out of the car, the brakeman, Campbell, said “It looks like they’re playing chicken”; Donnell testified that it looked to him like they “may be,” but, “you know, they may have trouble, it could have been a flat, it [the car engine] could have died, they may have been playing chicken I don’t — I didn’t know. All I know is that I was going to have to start getting ready to make some kind of a move.” He came to the conclusion that he was going to have to put the train in emergency when the driver’s head came up over the car; this is when he realized that the car was not going to move. The fact that Campbell said to him they’re just playing chicken with the train caused him to think, “well, maybe they are playing chicken with the train” and to delay applying the emergency brake; he said that when he saw a car stopped, “these people are just like me, they have to use their judgment too — I just have to use my better judgment, that’s all I can do”; he would have acted the same way if Campbell had said nothing; so he purposely delayed applying the emergency brakes in order to determine for himself whether they were playing chicken with the train. “Not much time” before the collision he saw Alvarez come out of the car; before that time, the train had been placed in emergency; after the driver came out of the car, he did not see anyone else— he thought the car was vacant and was very surprised to see Alvarez.
 

 Donnell said that before the driver got out of the car, it had sufficient time to clear the tracks; he did not put the train into emergency when the passenger came out of the car because he could still see the
 
 *343
 
 driver in the car and he was going to give him as much opportunity as he could to get the car started and off the tracks; he said “when the passenger got out, you still have the implication of maybe playing chicken or whatever, but when the driver gets out— you just know that the car is not going to move by itself. That’s what I have to assume.” After he saw the driver’s head, he put the train into emergency — just as fast as his reactions would allow; had he done so when the passenger got out, he did not think the driver would have had even more time to get off the track.
 

 He did not think putting the train into emergency would slow its arrival time at the crossing, as opposed to continuing his speed of 40 miles per hour; while he trav-elled the 500 feet [from the time he saw the car stop on the tracks until he put the train into emergency], he was watching the car, and he anticipated that he might have to put the train into emergency
 
 at some time.
 

 Donnell, when re-called and placed on direct examination by MKT testified further: there are occasions when people will stop on the track, act as if they cannot get off the track, and when a train gets close; speed off. This happens once a month “in the country,” once every third trip in San Antonio, and every other trip in Houston; he probably saw this twice each trip on the average, sometimes as many as 8 to 10 times; when this happens, he prepares to put the train in emergency. In this case, he threw the emergency brake as soon as he realized the car was not going to get off the crossing; even at that time, the car had time to do so;
 
 the train was 1000 feet away from the car when it first stopped on the crossing; even if he had put the train in emergency then, the train would have hit the car;
 
 he made the best judgment he could as to whether or not to put the train in emergency.
 

 He further said that: if he had applied the brakes at the 1000 foot range, the people in the car would have had more time than if he continued at 40 miles per hour; his experience is that cars will start out and go in front of trains when the train is within 300 feet, 100 feet or 10 feet of them; the train has the right of way at crossings; when you put the train in emergency, it is just floating on air” and if you do so, it will be 5-6 minutes before the train can be started again; he did not know the car was stalled or that its engine was stopped; possible dangerous factors in putting the train in emergency are: train make-up, curvature, grade, and loads to empty ratio; your own safety; the engine possibly can be knocked off the track; possible property damage if there is derailment; if some cars were derailed, they could go right out onto the road and hit someone driving on the road; you could tear up a fence or a house; and the personal safety of the two people in the caboose.
 

 Grover Cleveland Campbell, the head brakeman, testified: that he was seated on the left-side of the engine, with the engine on the right; when he could first see the crossing, he saw the car coming out from behind the embankment of IH 35; he saw the headlights of the car “heading” north; he saw the car when the lead unit of the train was on the trestle; the car was going a slow speed, 5 miles per hour and maintained this speed until it stopped on the tracks; when the car stopped on the tracks, he told Donnell that “I figured he was playing chicken with us”; the car did
 
 not stop
 
 for the stop sign; the train was 1504 feet away when the car stopped on the crossing; he saw no reason to place the train in emergency when the car stopped; he saw the passenger waving his arms; the train could have been placed in emergency then; he did not do so, because of his assumption that “they were playing chicken”; there were other fair and reasonable assumptions that he could have made, to-wit: that the car was stalled; or in distress; that there were three people in the car; or that a mother and child might be in the car; he chose to assume that the people were playing chicken with him.
 

 The brakeman further said: that the train could be derailed in an emergency stop; that he had been in trains “thousands” of times “when they were placed in emergency”; he remembered one derailment, and there were others, the number of which he could not recall; he did not feel, when he made the assumption that the car stopped on the tracks due to someone play
 
 *344
 
 ing chicken, that he was taking a real gamble; his assumption was fair and reasonable; playing chicken is a common practice.
 

 He first saw the car when it came from behind the embankment; Donnell put the train into emergency in the neighborhood of the switch of the passing track; it is common for cars to “creep” across the track in front of the train, or speed across; it is common for cars to stop on the tracks and make as if they can’t take off, and then as the train gets closer, to “take off”; this happens every trip he makes; the car had plenty of time to “get across the rail”; people came onto the tracks in an effort to play a joke on the train crew, to play chicken, and they will stand on the tracks and just see how far he would come without putting on the brakes; this is a common occurrence; it is not as common for a car to stop on the tracks as it is for someone to be “walking” on the tracks; he testified on his deposition that it is not a common occurrence “of a car coming on the track”; he did not know if the car was or was not stalled, he usually recognizes “a guy standing in front of the car waving his arms” as a distress signal; he had an opportunity to stop the train and chose not to do so; as long as the driver was in the car, he thought the car would have time to get off the track; when he decided to put the train in emergency, it was already in that status.
 

 Thomas Sopko, a rear brakeman on the train and who rode in the caboose said: he has been in trains that went into emergency; when this happens, “[y]ou brace yourself and prepare for the worst, which could be a derailment of the caboose”, resulting in its turning over and causing injury to himself; he has seen derailments when trains went into emergency; when the train went into emergency, it came to a smooth stop.
 

 Richard Looby, a Department of Public Safety patrolman, investigated the accident; Ledesma told him that he approached the track from the south, that he stopped at the stop sign, looked for a train, saw the train to his right, “figured” he could get across the crossing before the train got to it, proceeded — the car stalled on the tracks, and he unsuccessfully attempted to get it started again. All passengers attempted to exit the car. Tijerina related approximately the same facts to him; both said that Alvarez had difficulty getting out of the car — whether from confusion or not the officer did not know, but they said Alvarez attempted to get out the right front door by pulling the seat forward and then opening the door; the seat would not go forward, so Alvarez “finally did exit out the rear door.” Looby interviewed the engineer, who told him “they did notice that the car was on the track and that ...
 
 it was impossible for them to stop.”
 
 (emphasis added). The engineer told him that he did put the train in emergency, Looby talked to Ledesma, Tijerina, Donnell, and the conductor. Everyone said the car was stalled on the track; no one mentioned “playing chicken” or that “all they were trying to do was scare the gentleman [Alvarez].” Le-desma told him that he saw the train lights at the stop sign. He said that Ledesma saw the train lights when the train was at the trestle, 1500 feet away; in his opinion the car could probably cross the tracks before the train arrived; he thought that if the driver decided to cross the tracks and stalled, the driver and the friend and backseat passenger would have had time to get out of the four-door automobile.
 

 Elba Harris, the conductor, testified: that the horn on the train can be heard
 
 h
 
 mile away, or further. He was in the caboose; the train went into emergency; he heard Donnell say “We just hit a car.” Harris talked to Tijerina. He said that Tijerina was just walking around, saying
 
 “We was
 
 [sic]
 
 just trying to scare him, that’s all we was
 
 [sic]
 
 trying to do was just scare him.”
 
 (emphasis added). He asked Tijerina who was driving the car and Tijerina told him that
 
 he was.
 
 He identified Tijerina in open court as the one who told him he was the driver. On his deposition he had stated he did not know who the driver was, but knew, at trial, from having looked over the accident report that Tijeri-na said he was. Thus, there is a conflict in the testimony as to who
 
 was
 
 the driver. The MKT accident report also shows Tijeri-na to be the driver. Harris said that when a train is placed in emergency, it “comes to a floating stop.” Because of the slack
 
 *345
 
 action between cars, when the train is put into emergency, there is a possibility that those who are in the caboose could be hurt.
 

 John Bentley, an accident reconstruction expert for the plaintiff, gave testimony as to the location and distances from the crossing, of the whistle board sign, the trestle, the switch stand and the stop sign on Morrell Street. He detailed the length, make-up and weight of the train. He said that the length of the train, number of loaded and empty cars, and the pulling power in the train are factors to be considered in computing stopping distances. He said that the maximum available stopping capability of the train is “an emergency brake situation.” From the time the brake lever is placed in emergency, 10 seconds elapse before the lead unit (engine) has full brakes on it. On brake application, there is a sequential build up of the application of the brakes in each car back through the train. In this particular train, once the brake was placed in emergency, it would be 12.83 seconds before full brakes were on the train.
 

 He computed the stopping distance of the train, considering a reaction time of ¾ of a second. If travelling 35 miles per hour, once the lever is placed in emergency, the total stopping distance of the train would be 1100.2 feet. At 40 miles per hour, it would take 39x/2 seconds until the train came to a stop, during which time the train would travel 1394x/2 feet. At 40 miles per hour, the train was moving 58.66 feet per second. Thus, he said, once the brakes were activated, and excluding reaction time, it would take 1394.46 feet to stop. In order to stop short of the crossing, the brakes would have to be applied approximately
 
 1400 feet from the crossing.
 
 If one knows
 
 where
 
 the train stopped, it can be determined
 
 where
 
 it was placed in emergency. From pictures and measurements on the ground based on landmarks in the picture, the lead unit of the train stopped 950 feet beyond the crossing. So, according to his calculations, the train was 40 feet east of the switch station or 444.46 feet from the crossing when it was placed in emergency. His conclusion was that Alvarez exited the car and then his severed leg was caught between the car and the front unit of the train, that Alvarez’s foot was up in the air when contact was made and that Alvarez’s body was in a “run attitude.” His opinion was that it would have taken less than 12 inches for Alvarez to get his foot out of the way so that he would not be hit — it would have taken approximately .04 seconds to .07 seconds to do so.
 

 From the time the brakes were activated to the collision at the crossing, 7.33 seconds elapsed. If the brake application had been 75 feet, or 1.28 seconds sooner, the arrival time of the train would have been changed by .07 seconds. It was his opinion that if application of the brakes had been made at 525 feet from the crossing, rather than 450 feet, Alvarez would have “cleared the train.”
 

 Asked to assume that during the time the engineer was blowing his first' “whistle blast,” about mid-point of that whistle, he saw the car just a few feet from the crossing come up onto the crossing and stop, and at that point he was somewhere around three pole lengths (450 feet) west of the trestle, that he blew his whistle for five to six seconds during which time he did not apply his brakes, that he applied his brakes at about the time when he was going to blow his short blast when he was about at the point of the switch, Bentley expressed the following opinion: (1) that in five seconds the train would travel 293.33 feet, and in six seconds, 352 feet; (2) that the train, when it was three pole lengths from the trestle, would be 1054 feet from the crossing; (3) that the train would travel 565.54 feet before friction commenced (9.64 seconds); (4) had the engineer applied his brakes during the 5 or 6 seconds, the arrival time of the train at the crossing would be delayed an additional .46 seconds to .66 seconds (5) this would have given Alvarez more than ample time to clear the train.
 

 On cross-examination, Bentley testified: it was his experience, based on travelling with an engineer, that automobiles will cross in front of a train, even though the train is in hazardous proximity to the crossing; this occurs frequently enough that the train would be greatly impeded if the engineer put the train into emergency every
 
 *346
 
 time he thought an automobile was going to do that; if the train is going 40 miles per hour, going down the track, blowing the whistle, and an automobile gets close to the crossing, it is really not going to do a whole lot of good to try to slow the train down at that point — use of dynamic braking [“bringing the throttle down" and reversing the electric fields with the motor, attempting to go in the opposite direction], for example, would not be of any benefit because of the time element to get dynamic braking in process; “independent braking” likewise would not gain beneficial deceleration; if you put a train into emergency, you have done just about everything you can probably do to get the train stopped; to resort to putting the train in reverse would involve 10 seconds or more and would put the train into a skid, because you lose track adhesion when you do this; you do not want to do this. Even in emergency braking, you should not slide the wheels, because the temperature on the wheel will go to the melting point, and the train actually starts “skiing,” because you have lubricated (the track) with melted steel; so you don’t do this; you can stop the train 40 percent quicker by ordinary emergency braking, which does not involve sliding the wheels; people in the caboose can get hurt from application of emergency brakes; derailment can also occur, even at a speed of 15-20 miles per hour, if you have empty cars followed by loaded cars.
 

 At 40 miles per hour, if the engineer wanted to stop before reaching the crossing, considering reaction time and a stopping distance of
 
 1394-4-6
 
 feet, the
 
 engineer would have
 
 had to start reacting 60 feet west of the end of the trestle; to determine where the engineer began his reaction time before application of brakes took place, you would have to add 44 feet to the 444 feet he testified was the point where the train was put into emergency. Bentley knew what “playing chicken” was, having been at one time with the Department of Public Safety; he knew of accidents involving such; the practice started in California and came to Texas; it would take the car, travelling at 5 miles per hour, 3.64 seconds to clear the crossing; if the train was anywhere from 250 to 264 feet from the crossing, the automobile would have time to clear the crossing; from the front rail, it would take 2.08 seconds, during which time the train would have trav-elled 122 feet; it would take 28 feet for a car travelling 15 miles per hour to stop — or 6.78 feet for a car travelling 5 miles per hour.
 

 Bentley had investigated approximately 500 train accidents. In all but one, the train had been put into emergency; in only two instances did derailment occur.
 

 We hold that the above testimony raises a fact question to be submitted to and decided by the jury as to whether MKT's engineer and/or head brakeman made timely application of the brakes. The jury was not asked to make such determination; rather they were
 
 told
 
 by the court in the wording of the issue that MKT
 
 did not
 
 timely apply the brakes. The engineer testified that the train was 1000 feet away when the car came to a stop on the crossing; though the brakeman, at one point in his testimony estimated the distance to be 1500 feet, he saw no reason to put the train into emergency at such time. It is uncon-tradicted that the
 
 stopping distance
 
 of the train, with emergency application of the brakes, was 1394V2 feet,
 
 excluding
 
 reaction time; considering reaction time, if the operator wanted to stop the train before the crossing, the engineer would have to start reacting 60 feet west of the end of the trestle, or approximately 1444 feet from the crossing. If one accepts the engineer’s testimony that when the car stopped on the tracks, the train was 1000 feet away, it would be
 
 impossible
 
 for the train to stop before hitting the car. Other evidence indicating that the crew thought the car would timely leave the tracks raises a
 
 fact issue
 
 as to
 
 when
 
 application of the brakes should have been made. Whether the crew was using ordinary care in their belief that the car was “playing chicken” with the train was for the jury to decide. Bearing on that question was the testimony of Harris, the conductor, that Tijerina said immediately after the accident
 
 “we were just trying to scare him
 
 [Alvarez]” (emphasis added),
 
 *347
 
 which gives some weight to the testimony of the crew that it was not an uncommon practice for cars to “play chicken” with the train.
 

 Since the only act of negligence found against MKT was negligence “in not timely applying the brakes,” which finding was based upon the impermissible and direct comment by the court in submitting the issue, as above noted, the error was harmful and prejudicial.
 

 In so holding, we reject MKT’s argument that the evidence established as a matter of law that it was not negligent in its application of the brakes. In support of its argument, MKT relies on cases involving discovered peril. Discovered peril as an issue or an instruction has been abolished.
 
 French v. Grigsby,
 
 571 S.W.2d 867 (Tex.1978),
 
 Davila v. Sanders,
 
 557 S.W.2d 770 (Tex.1977).
 
 See Stanley v. Southern Pacific Company,
 
 466 S.W.2d 548 (Tex.1971) and
 
 Ford v. Panhandle & Santa Fe Ry. Co.,
 
 151 Tex. 538, 252 S.W.2d 561 (Tex.1952). Such questions as the one here involved are now to be submitted on negligence, contributory negligence, and comparative negligence issues.
 

 In view of our decision, we need not reach MKT’s other points of error, except to note that the testimony of the emergency room nurse relating to the strong smell of alcohol on Alvarez’s breath will become admissible under proper pleadings. The issue of the admissibility of MKT’s expert witness will likewise undoubtedly be resolved in a new trial.
 

 The judgment of the trial court is reversed; the cause is remanded for new trial.
 

 OPINION ON MOTION FOR LEAVE TO FILE SUPPLEMENTAL STATEMENT OF FACTS AND MOTION FOR SUBMISSION TO TRIAL COURT OF DISPUTE OVER ACCURACY OF STATEMENT OF FACTS
 

 Appellee Alvarez has filed a motion for rehearing, a motion for leave to file a supplemental statement of facts and a motion for submission to the trial court of the dispute over the accuracy of the statement of facts. On this day we will overrule Alvarez’ motion for rehearing without opinion. This opinion deals solely with the latter two motions; any reference to the motion for rehearing is made only to show the purpose for which the latter two motions were made, and the reasons for their disposition. Because we will not modify the judgment previously entered by this Court, and because we will not hand down
 
 any
 
 opinion or memorandum whatsoever in connection
 
 with our overruling of the motion for rehearing,
 
 Alvarez will
 
 not
 
 be entitled under Tex.R.Civ.P.Ann. 458(b) (Supp.1984) to file a second motion for rehearing in this Court.
 
 Cf. Stoner v. Massey,
 
 586 S.W.2d 843 (Tex.1979),
 
 Honeycutt v. Doss,
 
 410 S.W.2d 772 (Tex.1966) (filing of “memorandum opinion” correcting clerical error by changing two words in opinion, followed by notation that motion for rehearing is overruled, deprives order overruling motion of finality, and authorizes dissatisfied party to file second motion for rehearing under Rule 458). Having overruled Alvarez’ motion for rehearing without opinion, this Court will lack jurisdiction to entertain
 
 any
 
 motions whatsoever.
 
 Wilson Finance Co. v. State,
 
 348 S.W.2d 639 (Tex.Civ.App.1961, no writ).
 

 In his motion for rehearing, Alvarez contends that MKT failed to preserve the trial court’s error in commenting on the weight of the evidence in submitting special issue number one, because the statement of facts does not reflect that the trial court ruled on MKT’s objection to this error. Indeed, Alvarez goes even further and contends that “the record clearly demonstrates that
 
 no
 
 ruling was ever made on appellant’s objections to the court’s charge.”
 

 In support of his contention that MKT waived its objection to the charge, Alvarez cites
 
 Hernandez v. Montgomery Ward & Co.,
 
 652 S.W.2d 923 (Tex.1983). Since
 
 Hernandez,
 
 the Supreme Court has twice faced the issue whether the defendant waived an objection to the form of a special issue by failing to insure that the record
 
 *348
 
 reflected a ruling thereon, in
 
 Cogburn v. Harbour,
 
 657 S.W.2d 432 (Tex.1983), and
 
 Betty Leavell Realty Co. v. Raggio,
 
 669 S.W.2d 102 (1984).
 

 In
 
 Hernandez,
 
 the Court held the defendant had waived his objection to the form of a special issue, where the record did not reflect that the Court, expressly overruled the objection, even though (1) the defendant orally objected to the issue as a comment on the weight of the evidence, in that it assumed that plaintiff was falsely imprisoned; (2) the defendant orally suggested that an issue on the existence of false imprisonment be submitted; and (3) the trial court endorsed defendant’s special issues “denied.”
 

 In
 
 Cogburn,
 
 the Court held that the appellant had waived his objection to the failure of the Court’s charge to include an issue asking whether a partnership existed, where the “appellate record did not show an express ruling on the objection.” The Court rejected the contention that appellant had not waived his objection in that “the trial court impliedly overruled the objection to the charge since the charge included no single issue on the existence of a partnership.”
 

 In
 
 Raggio,
 
 the court held that the defendant did
 
 not
 
 waive his objection that the special issue miscast the burden of proof, where (1) the defendant orally objected to the misplacement of the burden of proof in the issue and then read aloud a special issue correcting the error; and (2) at the conclusion of his oral objections to the special issues, the court said “requested special issues are denied.” The only differences between
 
 Hernandez
 
 and
 
 Raggio
 
 are that in the latter case the defendant
 
 orally
 
 stated his requested special issue in full and the Court
 
 orally
 
 stated that such requested special issue was denied. The Court reasoned that the defendant restated his objection in reading aloud his requested special issue, and the court’s statement “addressed both the objection and the orally stated special issue.”
 

 The statement of facts originally filed in this Court reflects that on August 2, 1982, Judge Mathews, the trial court judge, excused the jury and directed them to return the following morning. The statement of facts does not reflect which of the following proceedings reflected therein occurred on August 2, and which occurred the following morning. After the transcription of MKT’s bill of exceptions, the only further notation in the statement of facts, apart from the reporter’s certificate, is the following parenthetical notation on page 974:
 

 Whereupon, Defendant’s exceptions and objections to the charge of the Court were dictated into the record, transcribed into typewritten form and attached hereto.
 

 Whereupon, arguments were had.
 

 End of proceedings.
 

 Despite this notation, MKT’s objections are
 
 not
 
 attached to the statement of facts or contained in a volume of exhibits. The reporter's certificate is signed and dated January 14, 1983.
 

 However, in the transcript there is a document entitled “DEFENDANT’S OBJECTIONS AND EXCEPTIONS TO THE CHARGE,” stamped as filed in the district court on November 23, 1982. The first objection contained in this document reads as follows:
 

 Defendant objects to Special Issue No. 1 in its statement [sic] that
 

 “Do you find from a preponderance of the evidence Missouri-Kansas-Texas Railroad Company was negligent in its (B) in not timely applying the brakes,” and “(D) in failing to sound the train whistle or horn?”
 

 for the reason that the wording of this issue constitutes an improper comment on the weight of the evidence by implying that the brakes were not timely applied and implying the horn was failed [sic] to sound.
 

 Defendant suggests the proper wording of (B) would be “... in its application of the brakes,” and that the proper wording of “D” would be “... in its sounding of the horn or failing to sound the horn.”
 

 
 *349
 
 At the end of this document is the typewritten notation “PRESENTED AND OVERRULED, AUGUST 3RD, 1982, PRIOR TO READING OF CHARGE TO THE JURY.” Immediately beneath this notation is the signature of Judge Mathews.
 

 Therefore, the transcript
 
 does
 
 reflect that MKT’s objection to special issue number one was ruled upon by the trial court. However, on April 3, 1984, Alvarez filed its motion for rehearing in this Court, and therein contends for the
 
 first
 
 time that the notation endorsed by Judge Mathews is incorrect, and that the record does not reflect that Judge Mathews ruled on MKT’s objection, but instead reflects the contrary. In support of the motion for rehearing Alvarez has attached as appendices thereto a photostatic copy of a supplemental statement of facts and an affidavit by Judge Mathews. On the same day, Alvarez also attempted to file separately the same supplemental statement of facts. The Clerk of this Court did not file the supplemental statement of facts, but marked it “RECEIVED.”
 

 The tendered supplemental statement of facts contains five pages marked as pages 974 through 978. This supplemental statement of facts contains the following:
 

 THE COURT: And I’m ready. Ready to talk about the Charge. Do you want to make your exception to Number One?
 

 MR. DONALDSON: Now comes Missouri-Kansas-Texas Railroad Company, Defendant in the above styled and numbered cause, No. 273,188,
 
 Guadalupe C. Alvarez Vs. Missouri-Kansas-Texas Railroad Company,
 
 in the 200th District Court of Travis County, Texas, and makes it’s [sic] objections to the Charge of the Court to be given to the Jury.
 

 (I) Defendant objects to Special Issue No. I in its statement [sic] that “Do you find from a preponderance of the evidence Missouri-Kansas-Texas Railroad Company was negligent in its [sic] (B) in not timely applying the brakes,” and “(D) in failing to sound the train whistle or horn,” for the reason that the wording of this issue constitutes an improper comment on the weight of the evidence by implying the horn was failed [sic] to sound. Defendant suggest [sic] the proper wording of (B) would be “... in its application of the brakes,” and that the proper wording of (D) would be “... in its sounding of the horn or failing to sound the horn.”
 

 * ⅜ # * * *
 

 Defendant further requests that these objections to the Charge be taken down by the Court Reporter to be typed up and filed as Written Objections to the Charge.
 

 After MKT’s prayer in connection with its objections, and apart from the reporter’s certificate, the supplemental statement of facts contains only the following parenthetical notation:
 

 Whereupon, the Jury entered the Courtroom, the Court read the Charge allowed [sic], and Arguments were had.
 

 END OF PROCEEDINGS.
 

 The affidavit attached to the motion for rehearing reads as follows:
 

 AFFIDAVIT
 

 On November 23, 1982, I signed Defendant’s Objections and Exceptions to the Court’s Charge, stating that the objections had been “presented and overruled on August 3, 1982, prior to reading of charge to the Jury.” I signed such a statement only after being assured by defendant’s counsel that the record reflected such rulings. Upon examination of the record however, it is clear that on August 3, 1982, I did not overrule defendant Missouri-Kansas-Texas Railroad Company’s objections to the Court’s charge.
 

 7s/ Charles D. Mathews
 

 Judge Charles Mathews Judge Presiding
 

 On the next day, April 4, 1984, Alvarez filed its motion (for leave) to file the aforementioned supplemental statement of
 
 *350
 
 facts. To this motion Alvarez attached another copy of the aforementioned affidavit by Judge Mathews.
 

 On April 9, 1984, MKT filed its reply to Alvarez’ motion to file the supplemental statement of facts. MKT states therein that it has “no particular objection” to the filing of the supplemental statement of facts. However, MKT objects vigorously to Alvarez’ contention that the “material now tendered [by Alvarez] demonstrates that the trial court failed to rule on the objections to the charge.” Moreover, MKT objects to the inclusion of Judge Mathews’ April 3 affidavit in the record, and states that the affidavit “is not in all respects even a correct statement of the current position of the trial judge, who has agreed to furnish a revised affidavit....”
 

 On April 10, 1984, Alvarez brought to this Court two more affidavits, which the Clerk of this Court marked “RECEIVED.” These affidavits read as follows:
 

 AFFIDAVIT
 

 On November 23, 1982, I signed Defendant’s Special Exceptions to the court’s charge, stating that the objections had been “presented and overruled on August 3, 1982, prior to reading of charge to the jury”, [sic] Upon examination of the record, it is clear to me that on August 3, 1982, I did not overrule Defendant Missouri-Kansas-Texas Railroad Company’s objections to the court’s charge.
 

 In my previous affidavit dated April 3, 1984, I included a statement which said that I signed the notation on the objections “only after being assured by Defendant’s counsel that the record reflected such rulings”, [sic] Defendant’s counsel has refreshed my memory on our discussions at the time I signed the notation and I wish to state that, no such assurance or representation was made. Nevertheless, my experience with my court reporter is such that had I overruled the objections it would have been reflected in the court reporter’s notes. In addition, I have no independent recollection of ever having overruled Defendant Missouri-Kansas-Texas Railroad Company’s objections to the court's charge.
 

 /s/ Charles D. Mathews Charles D. Mathews
 

 AFFIDAVIT
 

 I served as the official court reporter for the 200th Judicial Court in the case styled
 
 Alvarez vs. Missouri-Kansas-Texas Railroad Company
 
 which was tried between the dates of July 26, 1982 and August 3, 1982. I was present in the courtroom on August 3, 1982, and recorded all statements made by the Judge or any counsel during the day’s proceedings, including the counsel for the Defendant Missouri-Kansas-Texas Railroad Company’s objections to the Court’s charge and all statements of the Judge following such. My notes do not reflect that the Judge ever ruled on the Defendants objections to the Court’s charge. In addition, I independently recall that Judge Mathews did not rule on Defendant Missouri-Kansas-Texas Railroad Company’s objections to the Court’s charge.
 

 Is/
 
 Joy Hamilton Joy Hamilton
 

 On the next day, April 11, 1984, MKT filed its reply to Alvarez’ motion for rehearing. In this motion, MKT argues that the transcript does correctly reflect that Judge Mathews ruled on MKT’s objections to the charge, and that MKT therefore preserved these objections for appeal. MKT argues that (1) the supplemental statement of facts is consistent with a ruling by Judge Mathews, (2) the affidavits submitted by Alvarez do not persuasively rebut the occurrence of such a ruling, and (3) an affidavit by Dan Moody, counsel for MKT, together with a related exhibit, both attached to MKT’s reply, demonstrate that Judge Mathews did rule on the objections before he read the charge to the jury.
 

 In relation to the affidavits submitted by Alvarez, MKT argues as follows:
 

 
 *351
 
 It is highly questionable whether the present views of the trial judge should be accepted as establishing facts in conflict with what is stated in the transcript, particularly in view of the fact that the revision of his affidavit has already made evident that his memory of what occurred is now somewhat clouded by the mists of time. Moreover, the argument that the failure of the court reporter to record the ruling in her notes is hardly persuasive that no ruling was made, when the rest of that portion of the statement of facts is considered. It is quite obvious that the statement of facts does not record by any means everything of significance that occurred during the last two days of the trial. Volume IV of the transcript begins with the morning session of August 2, 1982. At the bottom of page 913 the noon recess is indicated. Then for all that appears in the statement of facts, all of the rest of the proceeding took place on August 2. However, it is undisputed that the events recorded at page 974 (or 974 thru 978 of the supplemental statement of facts) occurred not on August 2, but on August 3.
 

 The affidavit by Dan Moody reads as follows:
 

 AFFIDAVIT
 

 STATE OF TEXAS §
 

 §
 

 COUNTY OF TRAVIS §
 

 BEFORE ME, the undersigned authority, personally appeared Dan Moody, Jr., who, being by me first duly sworn, did state upon oath as follows:
 

 His name is Dan Moody, Jr., and he is an attorney at law practicing in Austin, Texas, as a member of the firm of Graves, Dougherty, Hearon & Moody. His firm acted as attorneys for the defendant Missouri-Kansas-Texas Railroad Company in the trial of Cause No. 27,188 [sic], styled
 
 Guadalupe C. Alvarez v. Missouri-Kansas-Texas Railroad Company, et al.,
 
 before the Honorable Charles D. Mathews, District Judge. Although the undersigned did not participate in the trial itself, he assumed primary responsibility for perfecting the appeal to the Court of Appeals.
 

 In that connection, it came to his attention, on or about November 15,1982, that there was a problem about whether or how the record being prepared would reflect the overruling of defendant’s exceptions and objections to the charge. The matter was discussed briefly with Mr. Mack Kidd, one of the attorneys for plaintiff Guadalupe C. Alvarez, on November 15, 1982. On November 17, 1982, the undersigned talked with Judge Mathews in the corridor of the courthouse about the absence of a written record reflecting the overruling of such objections. Judge Mathews stated that he thought his overrulings of the objections would be reflected in the statement of facts. The undersigned checked with Ms. Joy Hamilton, the official court reporter who had reported the case, who advised the undersigned that her notes, from which the statement of facts was being prepared, did not reflect the action by the Court on the objections to the charge. The undersigned reported what Ms. Hamilton had said to Judge Mathews. Judge Mathews then told the undersigned that he would record the action he took by noting on a copy of the objections that they were overruled prior to the delivering of the charge to the jury. Judge Mathews offered to make such notation on a copy of the objections at that time, but the undersigned expressed the thought that the other attorneys involved in the case should be furnished with a copy of the objections and advised as to how it was proposed that the matter be handled, in case they had any objections to such procedure. Judge Mathews concurred in that suggestion, but also stated that, regardless of any objection, he intended to see that the record reflected the action he had taken. Judge Mathews indicated at that time that he had no doubt that he had overruled the objections when they were presented.
 

 On that same day, November 17, 1982, the undersigned prepared a letter, ad
 
 *352
 
 dressed to Mr. Mack Kidd with copies to the other attorneys involved in the litigation, by which each was furnished a copy of the objections and exceptions to the Court’s charge as typed by the reporter, and was advised as to the situation, and as to how it was proposed that the Court’s action on the objections be reflected in the record. A true copy of such letter is attached to this affidavit as Exhibit “A”. Such letter includes an invitation to contact the undersigned if anyone finds any fault with the proposed handling of the matter. No objection was received from any party..
 

 Having had no response to the letter of November 17, on November 22 the undersigned attempted to reach Mr. Kidd by telephone, but was unsuccessful. On that same day, the undersigned again contacted Ms. Joy Hamilton, to determine whether the objections to the charge had been dictated on the afternoon of August 2, 1982 or in the early morning of August 3, since the information available to defendant was not clear on that point. After Ms. Hamilton advised that the events in question had taken place on the morning of August 3, the undersigned added to a copy of the objections the typed notation which appears just above the Judge’s signature at page 171 of the transcript. The undersigned then attempted again to reach Mr. Kidd. After failing to reach Mr. Kidd the undersigned contacted Mr. Bill Whi-tehurst, one of the other attorneys for the plaintiff about the matter. Mr. Whi-tehurst advised the undersigned that the letter enclosing a copy of the objections had been received, and that there was no objection to the handling of the matter as proposed in the November 17 letter.
 

 Thereafter, the undersigned took a copy of the objections, bearing the typed notation for the Judge’s signature, to the courthouse. The undersigned is now uncertain as to whether he personally presented the copy to Judge Mathews for his signature or not, but
 
 it is his best
 
 recollection that he left the copy with Ms. Hamilton, and that the Judge’s signature was actually obtained by Ms. Hamilton or perhaps by Ms. Ardelle Huntington, in the District Clerk’s office, who was then working on completion of the transcript. At any rate, the notation was signed by Judge Mathews, and the copy bearing his signature was filed with the District Clerk’s office and included in the transcript, which was completed and filed on the following day, November 24, 1982.
 

 Until receipt of Appellee’s Motion for Rehearing on April 4, 1984, the undersigned had no indication from anyone that any question existed about the fact that the objections to the charge were overruled exactly as stated by the notation included on the copy at page 171 of the transcript.
 

 /s/ Dan Moody, Jr. Dan Moody, Jr.
 

 Sworn to and subscribed before me by the said Dan Moody, Jr. on this the 10th day of April, 1984.
 

 /s/ Patricia Wightman Notary Public in and for the State of Texas
 

 The letter referred to in the affidavit, and attached thereto as exhibit A, states:
 

 November 17, 1982
 

 Mr. Mack Kidd
 

 Kidd, Whitehurst & Harkness
 

 24th Floor
 

 Westgate Building
 

 Austin, Texas 78701
 

 Dear Mack:
 

 RE: Guadalupe C. Alvarez v. Missouri-Kansas-Texas Railroad Company, et al.; No. 273,188, In the 200th District Court, Travis County, Texas
 

 With further reference to the matter we discussed briefly by telephone Monday, I am enclosing herewith a copy of Defendant’s Objections and Exceptions to the Court’s Charge, as typed by the reporter, Joy Hamilton, from her notes.
 

 It is my understanding that these objections were dictated in open court prior to the time the charge was given to the jury, and it is quite obvious that the
 
 *353
 
 objections were overruled, since the modifications requested were not made. However, there does not appear to be a written record of such overruling.
 

 I saw Judge Mathews in the corridor today and mentioned this situation to him briefly. He said that he thought that his overruling of the objections would be reflected in the Statement of Facts. However, Ms. Hamilton told me that her notes do not so reflect, and I reported this to Judge Mathews. He told me that he would record the action he took by noting on a copy of the objections that they were overruled prior to the delivering of the charge to the jury.
 

 It seems to me that this is a simple and appropriate way of handling the matter, and I believe will merely make the record reflect what occurred. However, before taking a copy to Judge Mathews for the indicated notation, I wanted to send you, and the other attorneys involved, a copy of of [sic] the objections, in order that you could review same and let me know if you find any fault with how it is proposed that this matter be handled.
 

 Since the transcript is due in just a few days, please call me as soon as you can with respect to this matter.
 

 Sincerely yours, /s/ Dan Moody, Jr. Dan Moody, Jr.
 

 Finally, on April 13, 1984, Alvarez has filed a “motion pursuant to Rule 377(e) regarding statement of facts.” In this motion Alvarez alleges that “there exists a dispute among the parties as to whether the statement of facts accurately reflects whether or not Judge Mathews ruled on [MKT’s] objections and exceptions to the Court’s charge.” Alvarez argues that this Court is therefore required under what is now Tex.R.Civ.P.Ann. 377(f) (Supp.1984) to “submit the matter to the trial court.”
 

 Because MKT does not object to the filing of the supplemental statement of facts, we grant Alvarez’ motion for leave to file it in this Court. MKT has never formally moved this Court to make the affidavits submitted by it a part of the record. Affidavits merely submitted in connection with a motion for rehearing or other motion in the Court of Appeals are not a part of the record, and may not be considered by the Court.
 
 Southwestern Bell Tel. Co. v. Griffith,
 
 575 S.W.2d 92, 96 (Tex.Civ.App.1978, writ ref’d n.r.e.);
 
 Orr Chevrolet, Inc. v. Courtney,
 
 488 S.W.2d 883, 885 (Tex.Civ.App.1972, no writ);
 
 Johnson v. Brown,
 
 218 S.W.2d 317, 325-26 (Tex.Civ.App.1948, writ ref’d n.r.e.);
 
 DeLeon v. Texas Employers Insurance Ass’n,
 
 159 S.W.2d 574, 575-576 (Tex.Civ.App.1942, writ ref’d w.o.m.).
 

 Even if we considered any of Alvarez’ motions to request that the affidavits be included in the record, we would be required to overrule such a request for the following reasons. First, the affidavits are immaterial because Alvarez has waived any failure of MKT to insure that the appellate record reflected a ruling by the trial court on MKT’s objections and exceptions to the charge, by not raising MKT’s failure before motion for rehearing and by contesting on the merits MKT’s point of error based on the court’s charge.
 
 Sanchez v. Texas Employers Insurance Ass’n,
 
 618 S.W.2d 837, 843 (Tex.Civ.App.1981, no writ);
 
 Ford Motor Co. v. Tidwell,
 
 563 S.W.2d 831, 836 (Tex.Civ.App.1978, writ ref’d n.r.e.);
 
 Sanders v. Davila,
 
 550 S.W.2d 709, 713 (Tex.Civ.App.1977), writ ref’d n.r.e., 557 S.W.2d 770 (Tex.1977);
 
 Thomas v. Morrison,
 
 537 S.W.2d 274, 279-81 (Tex.Civ.App.1976, writ ref’d n.r.e.).
 

 Second, Tex.R.Civ.P.Ann. 413 (1967), as it existed prior to 1984 amendments inapplicable here, provided that “all parties will be expected, before submission, to see that the transcript is properly prepared.” Although a Court of Appeals has discretion to permit filing after submission of a supplemental transcript or statement of facts under Tex.R.Civ.P.Ann. 428 (Supp. 1984) and 429 (1967), the Court should not allow such a filing after it has written its opinion and rendered its judgment absent some unusual circumstances. The Court particularly should not do so where, as here, the party seeking to file the supplemental transcript or statement of facts had
 
 *354
 
 prior notice of the alleged deficiency in the record. Alvarez had ample notice of any inaccuracy of the recital endorsed by Judge Mathews and of the failure of the statement of facts to reflect that Judge Mathews did not rule on MKT’s objections to the charge. By raising in its appellate brief the trial court’s error in submitting special issue number one, MKT called to Alvarez’ attention any potential failure of MKT to preserve this error. To permit Alvarez to supplement the record at this stage of appellate review “would be contrary to the spirit and purposes of Rules 386, 413, 428, and 429 of the Texas Rules of Civil Procedure and interfere with the orderly administration of justice.”
 
 Elkins v. Auto Recovery Bureau,
 
 649 S.W.2d 73, 76-77 (Tex.App.1983, writ ref’d n.r.e.). The wisdom of the rule restricting supplementation of the record on motion for rehearing before the Court of Appeals is amply demonstrated by the tortuous history, recounted above, of the proceedings in this appeal after this Court handed down its opinion.
 
 Saldana v. Garcia,
 
 155 Tex. 242, 285 S.W.2d 197, 201 (1955);
 
 Elkins v. Auto Recovery Bureau,
 
 649 S.W.2d 73 (Tex.App.1983, writ ref’d n.r.e.);
 
 Irrigation Construction Co. v. Motherall Contractors,
 
 599 S.W.2d 336, 343-44 (Tex.Civ.App.1980, no writ);
 
 Victoria Construction Co. v. Alamo Express,
 
 529 S.W.2d 250, 254-55 (Tex.Civ.App.1975, no writ);
 
 Archer v. Storm Nursery, Inc.,
 
 512 S.W.2d 82, 84-85 (Tex.Civ.App.1974, no writ);
 
 Sympson v. Mor-Win Products Co.,
 
 501 S.W.2d 362, 365 (Tex.Civ.App.1973, no writ);
 
 Coleman v. Pacific Employers Insurance Co.,
 
 484 S.W.2d 449, 453-54 (Tex.Civ.App.1972, writ ref’d n.r.e.);
 
 Stanfield v. Kroll,
 
 484 S.W.2d 603, 608 (Tex.Civ.App.1972, writ ref’d n.r.e.);
 
 DeLeon, supra.
 

 Third, this Court will not consider affidavits by the trial court judge or the court reporter which impeach the recitation in the transcript endorsed by the trial judge.
 
 DeLeon, supra; Ragland v. Cone,
 
 118 S.W.2d 1098, 1099 (Tex.Civ.App.1938, no writ);
 
 Davis v. Finch,
 
 236 S.W. 775 (Tex.Civ.App.1922, no writ). Accordingly, we overrule Alvarez’ motions insofar as they might seek to include any of the aforementioned affidavits in the record.
 

 We also overrule Alvarez’ motion requesting this court to submit the dispute over the accuracy of the statement of facts to the trial court. It is clear that the statement of facts, including the supplement which we have permitted to be filed, does
 
 not
 
 reflect that Judge Mathews ruled on MKT’s objections to the charge; nor does it reflect that he did
 
 not
 
 rule on them. The transcript does reflect that he did rule on them. Even if we assume that Rule 377(f) [formerly (e) ] requires the appellate court to submit to the trial court disputes over events which are not disclosed
 
 at all
 
 in the statement of facts, Alvarez has not cited to this Court, and we do not find, any authority requiring an appellate court to do so
 
 after the appellate court has written its opinion and rendered its judgment.
 
 The same considerations of judicial economy which underlie the rule against supplementation of the record at this time also require that Alvarez’ motion for remand under Rule 377 be overruled.
 

 Alvarez’ motion for leave to file the supplemental statement of facts is granted. Alvarez’ motions are overruled to the extent that they seek inclusion of any affidavit into the record. Finally, Alvarez’ motion for remand under Rule 377(e) [now 377(f) (Supp.1984) ] is overruled.